The issue on appeal is whether Congress intended CERCLA to apply to conduct in foreign countries. Let me begin very briefly by putting this issue in context. Are you conceding that this was an extraterritorial application? Worthy of comment. We do think it is an extraterritorial application. That's the argument. But will you also address in your argument what the standards would be if we consider this not to be extraterritorial? If you consider it not to be extraterritorial. Because the cleanup is in CERCLA operates in the United States. Correct. Then you reach the arranger liability issue of whether this even comes within the arranger liability issue. I don't want to drop your plan of argument. Just at some point in your argument, please address the alternative issue. Well, let me begin there, in fact. The standard is set forth in Section 9607A3. That's the arranger liability section that plaintiffs are asserting is the basis for liability in this case. Properly construed, that section applies only where a person has arranged for disposal or treatment of hazardous substances by another party or entity. Okay. Now, this is my understanding of that issue. Number one, it's a crazy statute, if that's what it means. Because it would – I mean, leaving aside the facts of this case, it would seem to say that if I drive a truck and dump a bunch of stuff in somebody else's land, I'm not an arranger, but if I hire somebody else to do it, I am an arranger. So the first person gets off without any liability and the second person doesn't. That doesn't make a lot of sense. If all of that happens in the United States, then you are liable. Why? Because you are the owner or operator of a facility, the facility being the truck. Not the facility where the – where the clean-up is. But you've made a disposal from your facility, the truck. My understanding is that the statute, at least the B part of it, says it has to be the owner and operator of the facility in which the – let's see if I can find the language for you. I don't – I do not think that works. Any person who at the time of disposal of any hazardous substance owned or operated any facility at which hazardous substances were disposed of. So that person – Any facility. It's any facility, not the site that's the Superfund site. Any facility. And the definition of facility is so broad under CERCLA – He did not own or operate a facility at which hazardous substances were disposed of. And if the hazardous substances were disposed of on somebody else's land, he did not own or operate those facilities. And if he takes the stuff and drives it over to somebody else's land, on your theory, he's not responsible. So that's problem one. Problem two is that we seem to have, as far as I can tell in the Ninth Circuit, two cases, one of which may support your argument. And another one of which essentially, to my mind, sensibly reads an or in where that comma is. And reads the by any other person as modifying the ownership of the stuff rather than bringing another person in for a range of liability purposes. That's rewriting the statute for Congress by instituting the or. But we have a case doing that. You do have a case doing that, but not addressing the issue of whether you need the involvement of a third party. So it did construe that language, but not in the context of answering the question whether you needed the involvement of a third party or not. In contrast, the Ninth Circuit case that goes the other way and reads by any other party or entity as modifying the disposal by, that one did involve the issue of who the parties are and whether there was a range of liability. I think that the ---- Kagan. Is it quite clear that we need to reach this issue in the current posture of the case? And there's a dispute between the parties as to whether we do or not. I don't see why we don't, but there's some dispute as to why we don't. Well, you certainly don't need to reach this question if you decide that this is in fact an extraterritorial application of CERCLA and that the Aramco presumption applies. Then you avoid this question altogether because it ends up Aramco and this Court's en banc decision in Superfilms would be dispositive. So you never get here. You just essentially assume that it would be an Arranger liability, but that because it's extraterritorial, the Aramco presumption applies and Congress has not clearly and affirmatively expressed its intent to apply CERCLA extraterritorially. Anything more on the Arranger liability? Well, there's law in the Third Circuit and the Sixth Circuit that says that there's no need to prove the involvement of a third party in the Kalamazoo case, for example. The Kalamazoo case. It's not called the Kalamazoo case. It's a Sixth Circuit case which says that all the government has to prove is that there is a third party in the Kalamazoo case. So it's not a case of dispositive, it's a case of dispositive response costs and defendant generated hazardous waste at the cleanup site. So it doesn't require the presence of a third party for Arranger liability. That's what this case is about. Many of those cases, including a lot of district court cases, don't even discuss the by any other party or entity language. A popular thing to do is just put in ellipsis where that is. The one case that probably has the fullest discussion of the Arranger liability issue is really the First Circuit case, and that one is the one that considers both alternatives. The alternative that you could insert for ---- And it comes to a crazy situation because it, in order to deal with the obvious notion that brokers were meant to be covered, they come to a complicated constructive possession theory. And instead of doing what it seems to me is almost surely the case, which is that comma was meant to be an or. I mean, that makes sense of the whole statute, both with regard to this problem of why would Congress ever want to absolve people who dump stuff themselves, and second of all, to make sure that people who are arranged for dumping somebody else's stuff are still responsible. I understand that you're substituting a comma for an or, an or for a comma, but there's just no way it makes sense without it for either purpose. All of these cases involve rather crazy circumstances. But I think if you consider the possibility that the so-called midnight dumper is covered by a broader view of the definition of facility, then it does make sense. They're just not. They may be under A, but they're not under B. I thought the facility language referred to the facility at which it was dumped or deposited, so that it would be hard to view the truck as a facility. It's a lot easier to view facility generously to reach that conclusion than it is to just insert an or coming in from the sky. I mean, that's what the First Circuit considered and rejected, saying, well, given the choice between the two, it makes a lot more sense to interpret the by any other party or entity language as modifying. Are you aware of any legislative history, background, analogy, anything that would clarify this point? Not this point. None at all on this point that I'm aware of. Maybe you want to go to the territorial stuff.  Okay. So let's assume for a second that if in the U.S. this would have been a ranger liability, then the question is, is this an extraterritorial application? It plainly is because plaintiffs are seeking to impose liability based on conduct in Canada. But the liability, just to ask you to clarify this in your argument, the liability is to clean up a site in the U.S. Maybe it would have some impact on Tecumseh's operations in Canada. I guess that's the argument. But any time there's a liability imposed in the U.S. on some company, it may affect their operations outside of the United States if they're an international company that operates elsewhere. The remedy, the actual cleanup would be in the United States. But that does not change the fact that it's an extraterritorial application because the liability is being imposed because of conduct that happened wholly in Canada. The Third Circuit's opinion in Asplund really addresses this issue, NLRB versus Asplund, where the argument, that very argument was made, that this is not extraterritorial because the remedy would be in the U.S., back pay, injunctive relief, et cetera, whereas the conduct was abroad for workers that were temporarily stationed abroad. And the Third Circuit held that's an extraterritorial application. And what is the conduct that took place in Canada? Is it the arranging or the putting it in the river or what? Here it's both the arranging and disposal, coincidentally. The plaintiffs and the State in their briefs allege that the arranger liability can be based on the placing of the slag or the discharge of the slag into the Columbia River at the Tecumseh. So isn't it also because of the way CERCLR operates that wasn't there a second disposal which was the release or the deposit of the components of the slag after it got to the river? My understanding is that the actual operative language of what the liability is for is for the release. And the release or a release certainly occurred over a long period of time at the Columbia River. The liability section is 9607A. And nowhere in 9607A does it mention release. Here, the section they're going under, 9607A3, simply imposes liability upon, you know, anyone who arranges for disposal by any other party or entity. So release or re-release or re-re-release is a very different concept from the liability trigger in 9607A3. And that's really what we're talking about here. Is that provision, the liability provision of 9607A3, can that permissively be applied extraterritorially under the facts of this case where there's no express congressional intent? What if TCM had loaded the slag into a truck in Canada and driven the truck across the border and dumped it in the Columbia River in the United States? Would that be an extraterritorial application? There would have been conduct sufficient to trigger liability under 9607 within the United States. So in that case, there probably would be liability because of the conduct in the United States. The conduct being driving the truck. If it's a TCM-owned truck, TCM driver, and there is conduct by TCM in the United States, that might be. It's not a TCM driver. They hire a company driver. Then I think the plaintiff and the state would have to prove, first, they'd have to prove arranger liability, which if you had a third party involved, they would. But still, the conduct, the conduct by TCM would be in Canada, not the United States. So I think that's an extraterritorial application triggering the RAMCO presumption. If they hire a truck knowing that it's going to go dump a bunch of stuff in Nevada, but it's not their truck, that's extraterritorial. Just for having hired it in Canada. The intent of the defendant doesn't matter under CERCLA. Here it's the intent of Congress. Did Congress intend that conduct? No. But they would have arranged for the disposal in the United States. I'm going to do this hypothetical. But they didn't. It wasn't their own truck. And the act of arranging would have been in Canada. And that makes it extraterritorial. That makes it extraterritorial. It would certainly be perceived by. I think that's part of the obverse of super films. In super films, my understanding is what they said was that the fact that the arranging took place in the United States doesn't make it not extraterritorial when everything happened outside of it. And you're now trying to take that and turn it backwards and saying that just because they're making some arrangements in Canada, that makes it extraterritorial, even though what they're arranging to do was in the United States. There are actually post-super film cases that address a similar situation and hold that where did the conduct occur? Where is the conduct that is the basis for liability? Well, what is the conduct? That's the question. And here the conduct is the arranging, the planning. And the disposal as well in this case. You're restricting it to loading the truck. But if it's part of the mission, part of the job to dump what's going on, what's in the truck into the river in the United States, isn't that part of the arrangement? That would just show intent. Because here the difference is you have the arranging and the disposal. The minute the slag hits the water in the Columbia River on the Canadian side, that's a disposal. It happens to be an extraterritorial disposal, but it's a disposal. It sounds like Bernard von Braun who said, I only send the missiles up, I don't care where they land. That's sort of your position. We just dump it in the river, we don't care where it lands. Certainly because of the policy behind the Aramco presumption to avoid unintended international discord, there is something to be said for looking at it from the view of the foreign sovereign or the corporation in the foreign sovereign. Would Canada perceive this to be an extraterritorial application with all the international discord or potential for international discord that flows from it? And clearly, yes, because viewed from the point on the Canadian side of the border, the only reason Techcominco is being sued under surplus for liability is because of the conduct of Techcominco in Canada. It's the conduct that's important here. So if you're really focusing on the arranging happening in Canada, and I think we probably need to do that because I do think that the liability in the statute under 106, liability is really under 106. 107, if I have the right section, 9607, sets up these presumptively responsible people. But the liabilities for release and the release, or at least a release, happened in the United States. So it has to be that they made the arrangement in Canada. And if that were the case, it just seems to me one could spin out numerous hypotheticals that would disprove it. If somebody is sitting in a company in Canada and arranging for something to happen in the United States, a murder in the United States, but they're sitting in Canada and they're arranging a murder in the United States, I find it very hard to believe that that's an extraterritorial application when the actual thing they arranged took place in the United States. But here you have the arranging and the disposal. I'm not sure of that. And one of my premises is that I'm not sure of that. I think there was a second disposal in the United States. There was a release later in the United States, but not a disposal. A release is something that just happens by itself, whereas a disposal needs the act of a party. It's not standing as a definition of disposal under the statute. It includes deposit. It includes various sub-definitions that would include the disintegration of the stuff after it got to the United States. Again, I think there's a confusion there between release and disposal. A release can just happen. Releases happen. But a disposal requires a party, in this case Tecumseh, and the disposal happened in Canada. What if they put it in the river in Canada? They know that water flows downhill and that that water they put it in will flow into the United States. They must intend the consequence that everyone would know of what they do in Canada. If they do that and they intend that when this water crosses the border, it's going to contaminate a river in the United States, the same river, is that extraterritorial disposal or is that domestic disposal? That's extraterritorial with an effect in the United States, and then you go under the Aramco analysis thereafter. There's no evidence that Congress intended a different result depending upon intent. In fact, CERCLA is notable in that there are no intent requirements really in CERCLA. I'd like to reserve my last two minutes for rebuttal. It's a difficult case. Well, let me ask you this question. Suppose that they decide to dispose of this stuff by sending it up in a rocket. It lands in the Columbia River in the United States. Now, is the disposal act limited to loading and shooting the rocket? I think you'd have a disposal there, but you'd also have all the conduct you need in Canada, so it's an extraterritorial application. The Canadians would certainly view that as extraterritorial. Even though the disposal is aimed at the United States. It had an effect in the United States, but the actual initial disposal was in Canada. But if it's aimed at the United States, then you say it's still extraterritorial. Right. And subject to the rampant presumption, where you have the threat of international discord? I think Judge Berzon's hypothetical. Let's say, and not in the corporate context, but some gangster hires a hitman to stand on the Canadian side of a river and shoot someone in the United States. And so the bullet will hit in the United States, but it's shot from Canada. And the person is charged with murder under a federal statute. Is that an extraterritorial application, or is that a domestic application? There you have conduct in Canada, so I think it would be one that would be properly brought up under Canadian laws. Here in the environmental arena, that's what all these treaties are for. The treaties are there to resolve these transboundary environmental issues. They certainly give a route, whether it's an exclusive route that bars the statute, I guess is the question. It's not that it's on its face exclusive. It's that it is the presumptive route until Congress expressly says that it wants to go in a different direction. Thank you, Your Honor. Well, we asked you a lot of questions. We will add three minutes to your time for rebuttal. Appreciate it. Make sure you can respond to the appellees here. Thank you. May it please the Court. My name is Paul Dayton. I represent Joseph Pocotas and D.R. Michelle, plaintiffs and members of the Confederated Tribes of the Colville Reservation. And also with me today in the courtroom is Mr. Virgil Seymour, vice chair of the Natural Resources Committee. I will explain today that the trial court correctly ruled that CERCLA applies extraterritorially to Tecumseh in this case because Congress intended to apply the acts to a person such as Tec who arranged to dispose of hazardous substances in the environment in the United States. And you're assuming this was an extraterritorial application? I am. But my colleague, Ms. Smith, representing the State of Washington, will speak after me, and she will explain that there is an alternate ground to affirm the trial court, and that is that this was a domestic application of United States law. Your argument supports the district court's rationale. That's correct. I can't resist saying that having listened to the exchange with counsel, that Tecumseh seems to think that if it went to the border where there was a hill, that it could dump its hazardous waste at the hill, a barrel of it, and watch it roll across the border and say that it had not acted in the United States. It's a fair argument. It's a question of what Congress intend and what's extraterritorial and what's not. And I'll leave both of that to Ms. Smith. And I will turn to the extraterritoriality question. This case is before this Court because Tecumseh, for almost 100 years, deposited the product of its smelter operations, slag. Is one of you going to address the arrangement liability question? We can both address it. I think Ms. Smith is geared up for it. You made some argument about why it wasn't properly before the Court. Could you tell us that? Well, it was addressed in the trial court in a, well, in an offhand way. It was not addressed as a motion to dismiss because you can't prove arranger liability. It was described as a reason why CERCLA does not apply here, why this is an extraterritorial application of United States law. So it wasn't technically, you can't meet the definition, but it was offered as this just can't apply to us. Now, in the court of appeals, I think the argument has become more focused to be more an argument that you can't prove arranger liability without regard to the location of operation. But I think the trial court concluded that it wasn't presented and, therefore, reserved it. Well, the trial court directly addressed the third-party question. And that's really the only, I mean, we wouldn't be able to say that they were an arranger, but we could certainly address the question, and the district court did, whether they are precluded from being an arranger because there wasn't a third party. So isn't that question, that narrow question before us? It was addressed in the trial court. And the trial court commented about the third-party question, and the briefs have talked about it as well. But I think they've all talked about it in a broader context than in a particular motion to dismiss. But I was saying that this case is before the Court because DeComenco for almost 100 years has deposited the byproducts of his operations into the Columbia River. Almost hundreds of thousands, millions of tons of slag. And yet, for almost 100 years, he did nothing to clean up the byproducts of his operations. The United States Environmental Protection Agency has now invoked CERPA to compel DeComenco to participate in the investigation and ultimate remediation of the hazardous substances that are found in the environment of the United States in northeast Washington. By the way, the EPA didn't ever bring any type of cleanup action, right, after their administrative order? They have commenced and continue to push the process of investigation forward themselves. They're investigating, but they haven't really – they're not here at the table with the plaintiffs, right? That is correct. They have not commenced an enforcement of their order, and neither have they objected to the plaintiffs' efforts. Neither have they submitted an amicus brief? There has been no brief submitted. So the EPA is sort of like the missing party here. Well, I don't know if they're missing so much. Their unilateral order indicated their belief that the act applies here. And the United States has, in the archaecology case, explained that it believes that application of CERCLA in this context is a domestic and therefore entirely appropriate application of CERCLA. Could we order the EPA to submit an amicus brief with its views on this case if we wanted to? Well, Your Honor, I didn't come prepared to talk about your authority to order them to do that. Well, go ahead with your argument. And so I mentioned that the EPA has commenced – issued a unilateral order to accomplish the investigation and ultimate cleanup of this site. If and no Canadian law and no law of any other nation applies to remediate the condition in this site in the United States. So if CERCLA does not apply here, no law of Canada and no law of any other nation will apply to remediate this site. And the citizens of the United States – But if – I mean, you've bit off the task of proving that even if extraterritorial the statute applies, and that's the harder version of how to get into this. But using that, what evidence is there, given the fair clarity with which this has to be done, that there was meant to be extraterritorial application, if we're assuming there was extraterritorial application? Well, I think what we see is that if you look at the United States Supreme Court authority on the presumption against application of extraterritorial application of United States law, you see a series of cases involving conditions in foreign lands. Labor laws in Saudi Arabia, Iran, Iraq, the protection against falling in a crevasse in Antarctica. So what's really happening, and this was my reaction to the district court's opinion, is that it's really morphing into the conclusion that there really was an extraterritorial application. I mean, that was really where you sort of wandered as he proceeded with his analysis. Well, you can argue, and certainly the Laker court and the Massey court, I think, conclude that in cases of domestic effect from external acts, it really is not extraterritorial at all. And the cases that are concerned with extraterritoriality are the cases in which someone wants to apply United States law to labor conditions in Saudi Arabia, and the court has rightly said, we presume that Congress intends to legislate with respect to domestic problems, not labor conditions in Saudi Arabia or crevasses in Antarctica. And so we will presume they did not intend that, absent clear contrary evidence. But in the circumstances in which there are domestic effects from external acts, almost every court that has looked at the question has concluded that United States law applies to the foreign actor that causes domestic injury. And that's occurred in Alcoa, Laker, Hartford, all apply United States law extraterritorially in the antitrust context. Tamari applies in the Commodities Exchange Act. Steele and Boulobo in the Lanham Act. There are a whole host of cases that do that. And the Seventh Circuit was quite direct about it. But if this were a case about environmental regulation, perspective regulation, which said, for example, you can't dump, you know, nobody can dump stuff into rivers, I presume you'd have a much harder problem in trying to prove that because the dumping into the river ends up affecting the United States, that the rule against dumping into rivers isn't extraterritorial. That's correct, because you'd have the prospect of clash between United States law and the law of other nations that may have a different position with respect to that. So the effect alone isn't going to do it for you. Well, actually that's not. The effect would be the same in that hypothetical. No, I think that's actually not correct, because Zucca films is a pretty good example of that. Because the United States law, particularly in the antitrust area, has been applied to regulate external conditions many times, even though it interferes with the law of other nations, because the court has been concerned that the law and events in other nations have caused harm in the United States. It's only, as in the Zucca films case, when there is clear evidence that Congress wants to defer to the regimes of other nations, that the Congress does not, that the courts do not apply United States law to remedy a foreign act that causes domestic injury. So you're basically reading Aramco as a narrow case dealing with situations in which the effects of the United States are either nonexistent or minimal, and that where the effects are major or at least discernible, the assumption, the presumption doesn't apply. Is there any case so stained? Well, I wouldn't say it's so narrow. I would say it's that whole line of authorities dealing with attempts by plaintiffs to apply United States law to remedy conditions in other lands. And the Court's hypothetical is fair. If this was a case trying to regulate, in which the United States law was applied to regulate how dumping occurred in Canada without regard to remediation of the problem, it would be a tougher case. But that's not this case. This is a domestic problem. This is a remedial statute. And there's no case that says that an act that is intended to remedy a domestic condition does not apply to remedy that simply because there is the domestic condition that was caused by external acts. I sort of doubted that I was going to share time with my colleague, and so I'll make only two points in conclusion. One is that the Seventh Circuit, in looking at this very question of how do we find congressional intent, has concluded that under the effects test, this is the Tamari case, courts have looked to whether conduct occurring in foreign countries had caused foreseeable and substantial harm to interests in the United States. The underlying theory is that Congress would have wished domestic markets and domestic investors to be protected from improper foreign transactions. And that is the case here. And in that, this case is like Simon, in that the Court must apply Circulate to accomplish the clear purposes of the statute. Beyond that, I wanted to say that there has been discussion of the subject of comedy in many of the briefs that have been submitted, but the answer to that question is clear under the Hartford decision, where the Court has said that comedy is not a concern to the exercise of jurisdiction unless it is impossible to comply with the laws of both nations, and no such impossibility has been alleged here. And that's all I have to say on this subject, unless the Court has questions on the extraterritoriality issue. Well, on the extraterritorial issue, assuming that's the controlling mode of analysis, does it matter if the conduct is aimed at the United States? So let's take you gave the antitrust example. If a bunch of people meet in Bangkok in a motel room and plan to fix prices in the United States, and they've sort of targeted the United States markets, that may be one thing. It may be something different if they've targeted a market in Japan and it has some incidental effect on the U.S. Here, are the acts that your clients complain of, are they aimed at the United States? Well, I think the trial court found that they were, and I think that they were. And I don't think there's any question about that. Does the targeting of the U.S. or the aiming at it have any bearing on your analysis of extraterritorial application of the law? I don't think it does. I think the question in terms of whether the statute has written and it was intended to reach the conduct in question, and I think the cases that have talked about conspiracies abroad have not focused on that question of whether the conspiracy was directed particularly at the United States market. They've looked at the question of whether it harmed the United States market, and I think perhaps they've inferred intent from the fact of harm. But I don't think there's been any analysis in the cases that one must show intent to affect a domestic injury. But plainly – But does arranged reliability under the statute include some intent note or at least a foreseeability notion? If you're going to arrange to do something, presumably that includes knowing what you're doing. Well, I think the act is written. I'm sorry? I think the act is written. I know it's a strict liability statute in general, but to arrange to dispose of something suggests that you're actually making a decision to dispose of it. Well, and I think they did. The grant, the court's concerned that – At a facility other than the one that you own, which here would have to be the Columbia River site. So doesn't the definition of arranged reliability take that into account? I think it does. Okay. Well, you wanted to have your colleague have some time.  And secondly, the arranged reliability third-party problem, which is very complicated. Let's touch on why this is just a domestic application of the statute. Your Honors, my name is Alexandra Smith. I'm an assistant attorney general representing the State of Washington. Please get a little closer to the mic, or speak up.   I'm an assistant attorney general representing the State of Washington. Sure. On your first question, is there – are there two disposals necessary? Not necessary, but existent. In this case, yeah. And I think the definition of disposal actually shows that the focus of the disposal is that it ends up at a United States facility. And if you look at the definition of disposal, it's in 42 U.S.C. 6901 subsection 3. And it basically says, Disposal means the discharge, deposit, et cetera, et cetera, of any hazardous waste into or on any land or water so that such solid or hazardous waste may enter the environment. An environment is defined in CERCLA to be land and surface water in the United States. So, but it seems to me, therefore, that once the stuff got to the United States and was sitting there and then disintegrated, that that was – there was first the slag got there, but then it was depositing other stuff once it disintegrated. So there was a second disposal, essentially, which occurred after the stuff got there. Say, yes, Your Honor. Yeah, there is a second disposal. The term disposal and how it's defined is broad enough to include sort of the leaching and the extra, I guess, movement of the particles in the United States. But, again, what triggers EPA's authority to act is the release of hazardous substances into the environment once they've gotten there. And that clearly includes the leaching of the hazardous substances from the slag. I'd like to for a moment focus on the domestic application of the statute. But isn't that very relevant? Because it means that actually the disposing wasn't just the dumping in the river, but it was after – it was arranging for it to go someplace where it was then going to dispose again. Yes. And I think that's what the statute is intended to cover, Your Honor. It is very relevant.  And it's a very important analysis that I don't think it matters that the initial arrangement for disposal took place in Canada, even for this to be a domestic application of the statute. If you look at the cases that analyze extraterritoriality, they involve cases where United States law is being applied to land in a foreign country or it's being applied to regulate conduct in another country. And it makes sense that those cases raise extraterritoriality issues because the land in the other country and the regulation of conduct in another country is what that other country also has sovereign authority over, has legislative power over. So in those cases, if you're trying to apply U.S. law to those items, then you do potentially have the kind of clash of laws that Aramco talks about. But if you don't have those, you don't have an extraterritoriality problem. And here I don't think anybody is arguing, excuse me, that CERCLA is being applied to land in Canada. I mean, it's clearly being applied just to remediate the land in the United States.  It's a remedial statute. It doesn't regulate anything. And so just as in product liability cases or cases based on other remedial laws like State laws, just because there's some tangential involvement of a foreign corporation or a foreign activity, it doesn't mean that the statute is being applied extraterritorially. Well, it's a little more than tangential, isn't it? It's the activities in Canada that brought about the ultimate release in the United States. Well, Your Honor, I don't think it's any different necessarily that the initial discharge took place in Canada than, say, the source of the defective product was a foreign manufacturer. In those product liability cases, you don't say that the product liability law is being applied extraterritorially. Instead, it's because it's a remedial statute. It's not going to regulate the manufacturer's conduct in that country. The manufacturer is still free to make the product the very same way it always has. But instead, it's just a focus on the remedial aspect. It's a remedy. Is there a release of the product or of the slag when it enters U.S. waters? Is it released again in a sense? It is, actually, because, again, the definition of a release into the environment is the United States. So our position is once it hit the border, once it crossed the border, it was a release into the United States. That's what I thought from the brief. So your position is that if they dump this in the Columbia River in Canada, 10 miles north of the border, and then a river flows across the border, as soon as it hits United States territory, it's viewed as a release of the contaminant in the United States water, right? That's correct. And it's pretty much analogous to if they hadn't put it in the Columbia River, but they built a big chute or something or a big canal, and they just dumped it in that and it flowed to the U.S. Exactly. It's just like a circle doesn't care where it came from or how it got there. All that matters for the application of a circle is that it got to the United States and it was released into the environment. So conceptually, you can view it that the slag is released the second it gets to U.S. territorial waters. Yes. And then you could also view it like contaminants are released again after they settle into the bottom of the lake or something and go through some natural process. So can you please address the arranged reliability problem, which to me is the hard question here? Well, I think in addition to the points you raised, Your Honor, that it is contrary to the purpose of the statute to interpret it the way tech advocates. But we do have a problem. We have this comma sitting there. Exactly. We don't have an or. We have what seemed to me to be two somewhat intentioned cases in this circuit. That's right. I think the important case in this circuit is the Cadillac Fairview case. And I disagree with Mr. Fong because I believe it actually does decide this issue because it was deciding whether it meant the phrase any other party or entity modified the ownership of hazardous substances or and that was the key issue. So how do you distinguish the Kaiser case? The Kaiser case, in my initial reading of the case, Your Honor, I felt it was more of an offhanded comment because it wasn't actually. It was, but, you know, we're sitting here as a three-judge panel and they didn't make a very definitive statement, even if it was only a sentence. It actually was two sentences. That's right. And what do we do with it? Well, I think the important part of all the cases that have been cited in the Court is none has allowed any party to avoid liability on the interpretation that tech advocates, even the First Circuit case. They read the case that way to broaden the category of parties to make sure they didn't inadvertently create a loophole. So I think, you know, the Ninth Circuit said in Cadillac-Fairview and other cases that surplus is to be interpreted very broadly. But you don't have any way of distinguishing Kaiser if Kaiser, in fact, holds, is a holding. Well, I think. It was a strange set of facts there because this was, in essence, the person who was arranged to do the disposing, and instead of doing the disposing somewhere else, he just disposed of it right where he was. Right. So there was something uncomfortable about it, thinking that this person wasn't the owner of the stuff was the problem, was covered as an arranger, but still the sentence seems to apply. Yeah. But I guess they weren't analyzing arranger liability. I mean, they explicitly started out by saying nobody has alleged that they are an arranger under the statute. So I find it hard to – I know. I understand your problems, Your Honor, but I just think that that analysis is wrong for the reasons you've stated. But also there's a textual basis I'd like to point out to the Court. If you look at the definition of arranger liability, it says any person who arranged for disposal, if you accept the text definition, they say you have to have the disposal has to be by another partner entity, and that should include transporters, one would think, that broad category. But the first two sentences of 9607A3 say any person who otherwise arranged for disposal or arranged with a transporter for disposal. So why would there be that language if text – if it means already what text it means? If you already need another party or entity pursuant to the last part of the statute, why would they also put in a language about contracting with a transporter? At a minimum, it's redundant. And it may render that language to be surplus, which we're not supposed to interpret statutes to do. So, again, the Court interpreted in Cadillac Fairview, they cited the Acido case with approval. And in Acido, they said we interpret surplus to serve its remedial purposes, one of which is to hold those responsible for contamination liable for the cost of cleaning up the contamination. Do you know any legislative history or other material that might illuminate this very strange sentence? No. Unfortunately, I don't. But if the whole basis behind surplus liability is to hold those responsible for pollution liable for the cost of cleaning it up, then Tecumseh is the exact kind of party that was meant to be held liable under surplus. They are the party responsible for the 13 million tons of slag in the United States. Is Tec right that this problem of the third party wouldn't arise ordinarily with regard to United States operators and owners and operators, or is that not right? I disagree with that. I mean, the interpretation they're advocating would apply whether they were in the United States or not. And really, if this were their strongest argument, you'd think that they would lead with that rather than getting into the thorny issues of extraterritoriality. So you would basically have, because you could have a situation in which the people who are doing the dumping are doing it in their own trucks and therefore and they're dumping it themselves and therefore they're not covered. I mean, that seems to be their argument. That is their argument. Yeah. I mean, sort of. I mean, Kaiser may have slightly supported that, although in a different circumstance. Our people support. But, again, even if that were, in fact, a definitive statement in Kaiser, then we'd argue that it's erroneous. It's wrong, Your Honors. Is there anything in the record other than the administrative order of the EPA that tells us what the United States government's position is on the issues that are presented here? Well, I think the UAO is, I think, in the record is the nub and substance of what the United States has said. And it's notable, though, they have not rescinded the order. But they did say in the archecology case in their briefing to this Court that not only did they think CERCLA applies to a release in the United States, but they think it's a domestic application of CERCLA. And that's on page 19 in their briefs at the footnote number two. Their briefs in which case? In the archecology case. But if whichever way the panel rules here, the United States could join in the losing party's CERC petition, I suppose. Yes, they can, Your Honor. Without contradicting anything of record. Exactly. It's a little bit difficult to understand what their position is. Okay. Thanks. And just in conclusion, Tecumseh has watched their waste go over the border for almost a century. And now they say somehow that that border is an impenetrable barrier to the United States seeking compensation for the harm that all their waste caused. So we ask that you affirm the district court, but do so on the grounds that it's a domestic application. I'm going to be spending your time a little bit here, but I don't remember any citations in their briefs of sort of common-law nuisance cases. You'd think there would be similar common-law nuisance cases. Are there any? There are, Your Honor. The Ohio v. Wyandotte case that was cited to the court. Although, ultimately, it was a Supreme Court case where they were trying to decide whether they had original jurisdiction. But it was a case where the State of Ohio was suing Dow Canada, as well as some U.S. companies as well, for mercury that had been put into a river and ended up in Lake Erie. And the court never said this is an impermissible extraterritorial application. It said this case can go forward, but it shouldn't go forward in the Supreme Court in the first instance. Thank you. Thank you. We will now hear from Mr. Farn. And, Mr. Farn, please proceed. Thank you, Your Honors. Of course, this Court could invite EPA to submit and make its brief, even though it might not be able to order it to do so. But even hearing the views of EPA wouldn't be dispositive, because this is a question of congressional intent. It's not a question of policy. The U.S. Supreme Court's recent case in the Specter v. Norwegian Cruise Lines makes clear when it characterizes Aramco and its presumption as a way to avoid inadvertently intruding on a sensitive area. And if nothing else, it's clear that this is a sensitive area. The whole purpose of the Aramco presumption is so that we don't have to be here forcing a court to go through and trying to guess what was in Congress's mind. What if it was on a plane? What if it was on a train? What if it was on a rocket? The Aramco presumption is there so that we don't have to guess. If Congress wants to apply CERCLA to situations like this, it should say so. Let me ask you about what I just asked the lawyer from Washington. Are there any common law nuisance cases historically that have similar facts? I should think there would be. The only one barely relevant is the one the State mentioned, the Supreme Court case which really doesn't reach the merits. And you could conceivably have common law nuisance actions, but nonetheless if Congress with the authority of the United States wants to put a statutory cause of action against a foreign corporation for conduct in the other corporation, it can do it. But it needs to say so expressly. Do you know of any examples where Congress has specifically provided for liability on an extraterritorial basis in a statute? In an environmental area? No. Any area. Is there any example of what you're saying? Aramco. After Aramco, Congress amended Title VII to expressly apply Title VII extraterritorially. So Congress, when the courts tell Congress, gee, this is unclear, you've got to tell us, because otherwise we're presuming that you did not intend extraterritoriality, Congress knows how to fix it. And it has. But to take this, I said that this seemed like Suba Films turned upside down. It's also Aramco turned upside down. I presume that if you had Toyota sitting in Japan and making arrangements about how to operate and writing an order saying, everybody will please discriminate against African-Americans in the United States and sending that off to its people in the United States, the fact that that was arranged in Tokyo does not make that extraterritorial, does it? I think the analysis there might be that it is an extraterritorial application, but if there are no treaties dealing with that, then perhaps there could be liability imposed on Toyota Japan. But it's not because it's a purely domestic application. It's because under the so-called effects exception that in the absence of any treaties, then perhaps that could be an exception to the Aramco presumption. But here you have treaties, and here Chuck Kamenko has made an offer to voluntarily assume the costs of the investigation and to address any risk identified in that investigation. So it's not a question of whether things are going to get cleaned up or not. It's just whether it's under CERCLA liability or not. Has anybody promised to clean anything up? Tech has made the offer to fund the investigation and to enter into a binding agreement to address any risk identified by that investigation. That's in the record at several points. I believe it's around page 67 of the excerpts of record. So the whole fight is over whether CERCLA liability. Well, I thought that the government offered to negotiate with them about a non-CERCLA solution and never got to a solution. Is that not right? Tech has made the offer. If the United States doesn't think the offer is adequate, then it has to work. Right, not because it's not CERCLA, but because it's not adequate. Not because it's not CERCLA, but because it's not adequate. It's not a remediation offer, right? I didn't hear you mention the word remediation. It's an offer to address the risk in whatever means appropriate, depending on what the investigation shows. It may be removal. It may be remediation. It may be monitoring. It could be any one of a number of things. You can't tell until the investigation, but we've agreed or we've offered to fund the investigation and thereafter to address any risk. It really is a case where the fight is over. Is this a CERCLA case or isn't a CERCLA case? Hypothetically, if EPA was not satisfied with the terms and conditions of the offer, that's exactly the sort of situation where the U.S. could escalate and begin negotiations with Canada or escalate even further and invoke the remedies and dispute resolution available under the Boundary Waters Treaty. Presumptively, that is the route that Congress intends in these cases. If they intend to do something differently, they have to say so. And here they haven't. They haven't. Congress has not indicated any intent to do anything other than the traditional means of resolving transboundary environmental disputes. One thing about your argument is that there is a Boundary Waters Treaty, but we've been playing around with very interesting hypotheticals, but I gather that it wouldn't address any of those hypotheticals. If they put something on the truck and drove it here, the Boundary Waters Treaty wouldn't affect that, right? So in terms of the conceptual problem of how CERCLA applies to cross-border dumping, this happens to be in a river, but that's kind of fortuitous. I'm not sure if fortuitous is the right word in this context. What I mean is that you're suggesting that because it was in the river, they could have gone to the Boundary Waters Treaty, all right? But if it wasn't in the river, you'd still be making the same argument. You told us that. Oh, but in the trail smelter arbitration in the 1930s, it was air pollution, and that was covered by the Boundary Waters Treaty. The parties agreed that this is something that would be appropriate for the IJC, and that's how they proceeded. How about Judge Schwarzer's hypothetical of putting toxins in a rocket and shooting them so they land in the U.S.? It's an ideal situation for the IJC to address that issue. Better than these courts. If Congress wanted to establish something other than the tried-and-true method recognized in 78 in Congress's own words as the preferred method of cooperative resolution, the onus is on Congress to say so. They've been on notice. So nothing has stopped the EPA from doing that in the meanwhile, right? They haven't done it. We deal with this big vacuum here, which is no EPA. Right. A month after the EPA's unilateral order, the government of Canada protested, and thereafter EPA has refrained from taking any further action. Including invoking the Boundary Waters Treaty or going to the IJC or doing any of those things? They've done nothing, so it would be sort of speculation as to why, but the fact is they've refrained. They've refrained from doing anything to enforce the unilateral administrative order. And they still have available all of the bilateral agreements and dispute resolution mechanisms that are available. But the meanwhile isn't the ñ I assume that whatever environmental problems were addressed in their initial administrative order have not been remedied to this day. So in a sense, the EPA is missing in action. I mean, they're just not on the field as far as we can see. And in a situation like that, one could surmise that these other factors of foreign policy are taking effect. That's certainly a possibility. And that's all the more reason for the courts not to assume without evidence that Congress intended private individuals to be able to force the field of play. If nothing else, there's nothing that shows that Congress intended to allow the private individuals to essentially step in and fill the vacuum for EPA or the United States government. That would be a big leak to assume that Congress intended that when, in fact, there's no evidence to suggest that Congress intended to cede the field to private individuals. It's an important case. We've had to go over your time, but we appreciate the assistance. Thank you. The arguments of all parties are very much appreciated. Bakudas versus Techcominco shall be submitted.
judges: Gould, Berzon, Schwarzer